IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | |
|---|---|
| KELLY HOAG,<br>        Plaintiff, | ) |
| | ) |
| | ) |
| v. | )   Civil No. 3:13cv477 (JRS) |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
|        Defendant. | ) |
| | ) |

## REPORT AND RECOMMENDATION

Kelly Hoag ("Plaintiff") is 35 years old and previously worked as a teacher's assistant, residential counselor, assistant director and director of a daycare center. On November 14, 2007, Plaintiff applied for Social Security Disability Benefits ("DIB"), stemming from Rheumatoid Arthritis ("RA"), with an alleged onset date of August 2, 2007. The claim was denied initially and upon reconsideration. On April 12, 2012, Plaintiff, represented by counsel, appeared before an Administrative Law Judge ("ALJ"), who denied her claims in a written decision on April 27, 2012. On June 21, 2013, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner of Social Security.

Plaintiff now appeals the ALJ's decision in this Court pursuant to 42 U.S.C. § 405(g), arguing that the ALJ erred in failing to afford Plaintiff's treating physician's opinion controlling weight and in assessing Plaintiff's credibility. The parties have submitted cross-motions for summary judgment, which are now ripe for review. Having reviewed the parties' submissions

and the entire record[1] in this case, the Court is now prepared to issue a report and

recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons that follow, the Court

recommends that Plaintiff's Motion for Summary Judgment (ECF No. 9) be DENIED, that

Defendant's Motion for Summary Judgment (EFC No. 13) be GRANTED and that the final

decision of the Commissioner be AFFIRMED.

## I. BACKGROUND

Because Plaintiff alleges that the ALJ failed to afford Plaintiff's treating physician's

opinion controlling weight and erred in assessing Plaintiff's credibility, Plaintiff's work history,

medical history, relevant testimony and third-party testimony are summarized below.

### A.  Education and Work History

Plaintiff was 28 years old when she applied for DIB.  (R. at 632.)  She completed her

college degree in psychology.  (R. at 52.)  Plaintiff previously worked as a teacher's assistant,

residential counselor, assistant director and director of a daycare, and most recently as a part-

time receptionist at a gymnastics facility.  (R. at 110, 632.)

### B.  Medical Records

#### 1.  Rosalia Lomeo, M.D.

In 2007, Plaintiff began seeing Rosalia Lomeo, M.D., a rheumatologist, for RA

treatment.  (R. at 114.)  On May 8, 2007, Dr. Lomeo's initial imaging returned "equivocal"

---

[1]     The administrative record in this case has been filed under seal pursuant to E.D. Va. Loc.
R. 5 and 7(C).  In accordance with these Rules, the Court will endeavor to exclude any personal
identifiers such as Plaintiff's social security number, the names of any minor children, dates of
birth (except for year of birth), and any financial account numbers from its consideration of
Plaintiff's arguments, and will further restrict its discussion of Plaintiff's medical information to
only the extent necessary to properly analyze the case.

results. (R. at 501.) The imaging of Plaintiff's spine, hands and chest showed osteopenia[2] but

no arthropathy[3] or bone erosions in the cervical spine, some evidence of arthropathy in both

wrists and mild changes of arthropathy in the right hand. (R. at 501.)

On September 20, 2007, Dr. Lomeo referred Plaintiff for more imaging. (R. at 457.) The

imaging revealed no hip abnormality and no foot fracture, dislocation, or other bony

abnormality. (R. at 457.) Dr. Lomeo referred Plaintiff to an orthopedist for an evaluation of her

right foot. (R. at 532.) X-rays showed some early degenerative changes. (R. at 532.) The

orthopedist diagnosed Plaintiff as having either overuse tendonitis or RA, but could not

differentiate between these possible diagnoses in Plaintiff's case. (R. at 532.) He recommended

immobilization and an equalizer walker. (R. at 532.)

On October 23, 2007, Dr. Lomeo listed Plaintiff's problems as RA, anxiety and

depression. (R. at 517.) Plaintiff's foot had improved since the orthopedic consultation, and she

tolerated all medications well. (R. at 517.) Additional observations included:  second MCP joint

synovitis with slight MCP joint subluxation on the left, synovitis in both wrists, decrease in left

wrist flexion and extension, left elbow contracture, no swelling in right foot but tenderness in

dorsum. (R. at 517.) Plaintiff had no focal deficits. (R. at 517.) Dr. Lomeo ordered Plaintiff to

continue her current medications and increased her Remicade dose. (R. at 517.)

On February 11, 2008, Dr. Lomeo recorded that Plaintiff was doing well, that she had no

morning stiffness, that she had less swelling in both hands and that she tolerated her medications

well. (R. at 518.) Dr. Lomeo again noted "second MCP joint synovitis with slight MCP joint

subluxation on the left;" "decrease in left wrist flexion and extension; left elbow contracture;"

---

[2]     Osteopenia is "any decrease in bone mass below the normal." *Dorland's Illustrated Medical Dictionary* 1347 (32nd ed. 2012).

[3]     Arthropathy is "any joint disease." *Dorland's Illustrated Medical Dictionary* 158 (32nd ed. 2012).

and "no focal deficits;" however, there was "less puffiness in both wrists." (R. at 518.) Dr. Lomeo continued most of Plaintiff's medications, although she reduced the Methotrexate dose. (R. at 518).

On April 15, 2008, Plaintiff presented to Dr. Lomeo with low-grade fevers. (R. at 578.) Plaintiff also relayed that she was planning a pregnancy for September and wanted to stop taking Methotrexate. (R. at 578.) Dr. Lomeo decreased Plaintiff's Methotrexate dosage accordingly with eventual orders to discontinue, while continuing the Remicade treatment, which Plaintiff tolerated well. (R. at 578.) On May 1, 2008, Plaintiff stopped taking Methotrexate. (R. at 575.) On May 29, 2008, Dr. Lomeo increased Plaintiff's Remicade dosage, noting that Plaintiff had more joint pain and swelling, especially in her left hand. (R. at 577.) On June 4, 2008, Plaintiff complained of head pain, dizziness and light-headedness. (R. at 576.) Plaintiff had no vision difficulties, fever or head trauma, and a CT scan returned normal results. (R. at 576.) Dr. Lomeo continued Plaintiff's medications and noted that Plaintiff's arthritis was under control. (R. at 576.)

On July 28, 2008, Plaintiff complained of increased hand arthritis, but Dr. Lomeo continued to withhold all medications. (R. at 575.) After Plaintiff's first 14 weeks of pregnancy, Dr. Lomeo reported that Plaintiff was doing well and had no joint pain. (R. at 614, 618.) On January 28, 2009, at 21 weeks into her pregnancy, Plaintiff complained to Dr. Lomeo of some right shoulder pain. (R. at 613.) On March 16, 2009, at 28 weeks into her pregnancy, Plaintiff had no joint swelling or pains at all. (R. at 612.) Dr. Lomeo noted that Plaintiff was doing very well. (R. at 612.) On April 29, 2009, Plaintiff complained of left shoulder pain. (R. at 611.) Dr. Lomeo opined that Plaintiff "ha[d] done remarkably well during this pregnancy." (R. at 611.)

4

On July 22, 2009, Dr. Lomeo completed a physical residual functional capacity ("RFC") assessment of Plaintiff. (R. at 647.) Dr. Lomeo opined that Plaintiff could sit, stand or walk for no more than 30 minutes at a time and for no more than one hour total during an eight-hour work day. (R. at 647.) Plaintiff could never lift/carry anything more than five pounds and that weight only occasionally. (R. at 647.) Plaintiff was unlikely to be punctual because of her regular morning stiffness and unlikely to maintain regular attendance because of reasonably expected exacerbations of her conditions due to her RA. (R. at 647, 649.) Plaintiff's symptoms constantly interfered with her attention, concentration, and ability to remember and carry out simple instructions. (R. at 648.) As a result of Plaintiff's symptoms, Dr. Lomeo opined that there was no expectation that Plaintiff's functioning capacity could extend beyond her activities of daily living ("ADL"). (R. at 647.) In an RA Impairment Questionnaire, Dr. Lomeo opined that the RA moderately interfered with Plaintiff's ability to perform both fine and gross dexterous movements with both her hands. (R. at 650.) Dr. Lomeo indicated that Plaintiff experienced moderate, bilateral interference with locomotion in her hips, knees and the bones of her feet. (R. at 651.) Dr. Lomeo indicated that the nature and extent of Plaintiff's symptoms was severe, additionally stating that Plaintiff's hand deformities made it difficult to engage in all activities with her hand. (R. at 652.)

On September 1, 2009, Dr. Lomeo recorded that Plaintiff still had hand pain and swelling, despite restarting Remicade. (R. at 676.) Plaintiff also complained of insomnia and of having more than one hour of morning stiffness. (R. at 676.) Dr. Lomeo prescribed Lunesta and re-started Plaintiff on Methotrexate. (R. at 676.)

On September 23, 2009, Dr. Lomeo noted that Plaintiff still had more than one hour of morning stiffness, hand pain and swelling. (R. at 675.) Dr. Lomeo opined that Plaintiff had a

possible right hand tendon rupture. (R. at 675.) Dr. Lomeo also noted that Plaintiff had a

"decrease in right fifth digit extension." (R. at 675.) Dr. Lomeo reported that Plaintiff tolerated

her medication well. (R. at 675.) On October 9, 2009, imaging of Plaintiff's right wrist revealed

partial longitudinal splitting of the extensor carpi ulnaris tendon. (R. at 674.) Plaintiff's other

extensor and flexor tendons were "otherwise unremarkable" and had no evidence of significant

tendinopathy or tenosynovitis. (R. at 674.) On November 4, 2009, Plaintiff had hand surgery to

correct the split tendon and afterwards attended physical therapy through February 5, 2010. (R.

at 672, 678.)

On January 5, 2010, Dr. Lomeo opined that Plaintiff healed well from the surgery and

was stable on her medications. (R. at 671.) On May 20, 2010, Plaintiff complained of right hip

pain, which Dr. Lomeo diagnosed as right trochanteric bursitis and treated with an injection of

Depomedrol and Lidocaine. (R. at 668.) On August 24, 2010, Dr. Lomeo noted that Plaintiff

had diffuse myalgias and arthralgins along with more hand pain. (R. at 667.) Dr. Lomeo opined

that Remicade was no longer working well and switched Plaintiff to Actemra while continuing

Methotrexate. (R. at 667.) Dr. Lomeo also changed Plaintiff's antidepressant from Lexapro to

Zoloft. (R. at 667.)

On January 24, 2011, Dr. Lomeo reported that Plaintiff was doing well on Actemra, but

experienced insomnia, fatigue and had a rash on her arms and abdomen. (R. at 666.) On June

16, 2011, Plaintiff complained of morning stiffness, fatigue and trouble with her ADLs. (R. at

665.) Dr. Lomeo noted that Actemra may have been helping with Plaintiff's pain. (R. at 665.)

On November 10, 2011, Plaintiff returned to Dr. Lomeo after experiencing severe left foot pain.

(R. at 662.) After negative radiograph showed no fracture, Dr. Lomeo ordered an MRI that

revealed severe synovitis. (R. at 661.) Dr. Lomeo changed Plaintiff's prescription from Actemra to Orencia and noted that Plaintiff felt that it helped partially. (R. at 661.)

On February 27, 2012, Dr. Lomeo reported that Plaintiff's arthritis improved on Orencia, though Plaintiff still complained of pain and swelling in her hand, all day stiffness and pain and swelling in her foot. (R. at 660.) Dr. Lomeo's external observations at this visit read: "second MCP joint synovitis with slight MCP joint subluxation on the left; less puffiness in both wrists; decrease in left wrist flexion and extension; left elbow contracture," and indicated that Plaintiff had no focal neurological deficits. (R. at 660.) Dr. Lomeo recommended that Plaintiff continue the same RA treatment. (R. at 660.)

### 2. Consultative Exams

On January 25, 2009, Plaintiff attended a consultative examination with Ericka Young, D.O. (R. at 580.) Plaintiff was alert and oriented, and demonstrated her ability to walk on both her toes and heels, to hop and to stand on one foot at a time. (R. at 581.) After testing Plaintiff's coordination, range of motion, motor strength and reflexes, Dr. Young opined that Plaintiff could stand or walk approximately four to five hours in an eight-hour workday, though she may need to take multiple breaks to rest her back and joints. (R. at 580-82.) Plaintiff had no restrictions on sitting, and she did not need an assistive device. (R. at 582.) Plaintiff could frequently lift less than ten pounds and occasionally lift ten pounds. (R. at 582.) Plaintiff would have trouble with grip and manual dexterity, and she would have some manipulative limitations with reaching, handling, feeling, grasping and fine fingering. (R. at 582-83.) Plaintiff would have some trouble with bending, stooping and crouching, and should not climb. (R. at 582-83.) Plaintiff should not work in environments with extreme temperature changes. (R. at 583.)

On December 10, 2011, Plaintiff saw Tanu Chandra, M.D. for an updated consultative examination. (R. at 654.) Plaintiff rated her pain intensity as 3-4/10 on a good day, 9/10 on a bad day and 6/10 on the day of the exam. (R. at 654.) Plaintiff cared for her children and performed some household chores. (R. at 655.) Dr. Chandra observed that Plaintiff was alert, had normal memory and good concentration, and had normal tandem walking. (R. at 656-57.) Plaintiff's hand-eye coordination was good, her muscle strength rated at 5/5 for all but her left hand grip, which rated at 4/5. (R. at 657.) Plaintiff demonstrated the ability to lift, carry and handle light objects, to squat and rise with ease, to rise from sitting without assistance, to get up and down off the examination table without difficulty, to walk on heels with moderate difficulty, to walk on toes of her left foot, to hop on her left foot and to dress and undress adequately. (R. at 657.) Further, Plaintiff had normal range of motion in all areas. (R. at 657.) Dr. Chandra opined that Plaintiff could sit/walk normally in an eight-hour workday with normal breaks, and she could be expected to lift/carry twenty pounds frequently and thirty pounds occasionally. (R. at 658.) Plaintiff had no limitations on bending and other movement. (R. at 658.) Her only manipulative limitations pertained to fine movements and grip with her left hand. (R. at 658.) Dr. Chandra found no relevant visual, communicative or environmental limitations. (R. at 658.)

### 3. State Agency Physician

On February 5, 2009, William Amos, M.D. completed a physical RFC assessment. (R. at 599.) Dr. Amos opined that Plaintiff could occasionally lift/carry twenty pounds, frequently lift/carry ten pounds, stand and/or walk from two to five hours in an eight-hour workday and sit (with normal breaks) for six hours in an eight-hour workday. (R. at 600.) Plaintiff had a limited ability to push and pull with her upper extremities. (R. at 600.) Plaintiff could frequently climb, balance and stoop, but only occasionally kneel, crouch and crawl. (R. at 601.) Plaintiff had

limited ability to reach in all directions and to finger with both hands, but was unlimited in handling and feeling. (R. at 601.) Dr. Amos indicated that Plaintiff should avoid concentrated exposure to wetness and humidity, as well as even moderate exposure to extreme cold. (R. at 602.) Plaintiff had no visual or communicative limitations. (R. at 601-02.)

C. Function Reports

On March 17, 2008, David L. Cundiff completed a Function Report for Plaintiff in which Plaintiff indicated that she lived at home with her family. (R. at 319, 326.) Plaintiff's day consisted of showering, dressing, eating meals, caring for her daughter and pets, watching TV, reading and assisting her husband in preparing meals. (R. at 319-20.) Plaintiff's husband, father and aunt all assisted Plaintiff. (R. at 320.) Plaintiff's condition affected her ability to run, lift over five pounds, squat, crouch, walk, type, write, grasp, stand and drive for extended periods of time. (R. at 320.) She experienced trouble sleeping because of her condition. (R. at 320.)

Plaintiff's condition made getting dressed, getting in and out of her tub/shower, caring for her hair, shaving, cutting and slicing food, cleaning herself and driving for more than 20-25 minutes difficult. (R. at 320.) Plaintiff needed no special reminders to tend to her personal needs or to take her medicine. (R. at 321.) Plaintiff prepared her own meals daily. (R. at 321.) Plaintiff indicated that standing at the stove for long periods, cutting and chopping ingredients, opening containers and lifting pots and pans had all become difficult and that she needed assistance to prepare "full meals." (R. at 321.)

Plaintiff could do laundry and clean for about 20 minutes at a time. (R. at 321.) Plaintiff could not carry a laundry basket, perform strenuous cleaning and do other household chores and yard work. (R. at 321.) Plaintiff indicated that she went outside three or four times a week and could go out alone. (R. at 322.) When she went out, she would drive or ride in a car. (R. at

9

322.) She regularly went to the grocery store and her father's house. (R. at 323.) Once or twice a week, Plaintiff went shopping to buy food and household items. (R. at 322.) Plaintiff indicated that she could pay bills, handle a savings account and use a checkbook, but she could not count change, because she had difficulty grasping coins. (R. at 322-23.)

Plaintiff listed her hobbies as reading and watching television, both of which she did daily. (R. at 323.) Plaintiff visited friends once weekly and talked with friends and family on the phone daily. (R. at 323.) She needed someone to accompany her on outings sometimes, and her condition reduced the amount of time that she spent visiting others. (R. at 323-24.) Plaintiff had no problem getting along with others or authority figures. (R. at 325.)

Plaintiff's joint pain and stiffness generally affected her abilities to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, concentrate, complete tasks and use her hands. (R. at 324.) Plaintiff had a doctor-prescribed brace for sleeping and typing. (R. at 325.) She could walk 200 yards before needing rest for several minutes. (R. at 324.) She usually finished what she started and followed written and spoken instructions well. (R. at 324.)

On March 20, 2008, Plaintiff completed a Pain Questionnaire in which she reported that she suffered pain in all of her joints. (R. at 328.) Plaintiff described the pain as aching, stabbing, burning, throbbing and cramping. (R. at 328.) The pain ranged daily from a "mild ache" to a "severe aching and throbbing," and sometimes stayed in one place and on other occasions moved. (R. at 328.) Plaintiff estimated that the pain varied in duration from "a couple hours" to 24 hours. (R. at 328.) Overuse of joints and the continuous use of any joint for an extended period of time increased Plaintiff's pain, and the pain kept her from bending, squatting, stooping, reaching, standing or sitting. (R. at 328-29.) Resting, not using the affected joints and taking

medication relieved Plaintiff's pain. (R. at 329.)  Plaintiff used Etodolac for pain twice a day,

Methotrexate every week and underwent Remicade treatments every eight weeks. (R. at 329.)

On September 10, 2008, Plaintiff completed another Pain Questionnaire and reported

pain in her neck, shoulders, elbows, wrists, hands, fingers, hips, knees and her right foot. (R. at

383.) Plaintiff described the pain as aching, stabbing and throbbing. (R. at 383.) Plaintiff

indicated that the pain stayed in one place, but could occur in multiple places. (R. at 383.)

Plaintiff estimated that the pain "lasts anywhere from one hour to all day." (R. at 383.) Overuse

of her joints and general daily activities, such as grasping objects with hands, climbing stairs,

using a hairdryer and driving, increased Plaintiff's pain. (R. at 383.) Again, Plaintiff indicated

that her joint pain and stiffness could prevent her from bending, squatting, stooping, reaching,

standing or sitting. (R. at 384.) Rest, heat and avoidance of any physical activity that put strain

on joints alleviated Plaintiff's pain. (R. at 384.) Plaintiff indicated that she did not take pain

medication. (R. at 384.)

D. Plaintiff's Testimony

On August 11, 2009, Plaintiff, represented by counsel, testified during a hearing in front

of an ALJ. (R. at 105.) Plaintiff testified that she worked for Paragon Gymnastics after her

alleged onset date. (R. at 110.) She did "front desk type work," mainly inputting registration

forms into the computer, but also answering phones and occasionally working on the gymnastics

floor. (R. at 110.) Plaintiff left this job, because she experienced trouble inputting forms. (R. at

111.) Additionally, helping on the floor with the children became difficult, because it involved

standing for long periods of time. (R. at 110-11.) Plaintiff left her previous jobs as daycare

director and residential counselor at a home for disabled adults. (R. at 111.)

11

Plaintiff was pregnant with her second child for much of the time between her onset date and the hearing. (R. at 112.) She went off her RA medication pre-pregnancy and, during that time, experienced trouble with her hips, knees and hands. (R. at 126-27.) During Plaintiff's pregnancy, her RA went into partial remission. (R. at 132.) However, within three weeks of giving birth, Plaintiff had a "very bad flare" of RA, prompting her to re-start her medications. (R. at 113.)

Plaintiff testified that she was right hand dominant. (R. at 114.) She used her computer mainly for checking email. (R. at 114.) Because of pain and difficulties with typing, Plaintiff would not type long responses to messages. (R. at 115.) She drove herself places approximately twice a week. (R. at 115.) Plaintiff watched videos with her husband or went for coffee or lunch with her friends or father. (R. at 118.)

Plaintiff experienced discomfort after sitting with her knees bent in one position for approximately twenty minutes. (R. at 119.) Plaintiff estimated that she could not do things with her hands for longer than five to ten minutes. (R. at 119.) Plaintiff felt that fatigue and morning stiffness hindered her from attending a job regularly. (R. at 120.)

Depending on her pain level, Plaintiff would walk a small circle in her neighborhood for about 25 minutes. (R. at 121.) Plaintiff could usually take care of her personal needs without help, but on bad days she needed assistance. (R. at 122.) Her younger sister helped around the house three or four days a week. (R. at 122.) Plaintiff could do light cooking but nothing that required bending, lifting heavy things, prolonged standing or chopping. (R. at 123.) Plaintiff testified that she could lift a gallon of milk using both hands. (R. at 123.)

Plaintiff testified that her husband changed his job to be closer to her, so that he could come home and help out if she had a bad RA flare. (R. at 124-25.) Additionally, Plaintiff had

relatives and friends who helped with her and her children most days in a month.  (R. at 127-28.)
On a good day, Plaintiff could move around well within 30 minutes of waking up and she could
go for a walk, drive to a friend's house and fully take care of her youngest child.  (R. at 130.)  On
bad days, Plaintiff could not go downstairs and engage with her children for several hours, and
she generally stayed in bed.  (R. at 132.)

On April 12, 2012, Plaintiff appeared before a second ALJ for a hearing on remand.  (R.
at 48.)  All testimony from Plaintiff during the prior hearing was made part of the record.  (R. at
50.)  Plaintiff lived with her husband, two children and her sister in a two-story home.  (R. at 51.)
Plaintiff's bedroom was on the second floor.  (R. at 51.)  Plaintiff testified that she was in
constant pain from RA and "pretty much every joint in [her] body" had been affected.  (R. at 53.)
Plaintiff estimated her daily pain level was 5-7/10.  (R. at 54.)  Any activity performed for longer
than five to ten minutes aggravated her pain.  (R. at 54.)  Additionally, Plaintiff experienced side
effects from her medications that included nausea, diarrhea, fatigue, weight loss and difficulty
concentrating.  (R. at 55.)

Plaintiff testified that she could not walk a full city block without needing to stop and
could not stand for more than five to ten minutes before needing to sit.  (R. at 55-56.)  Plaintiff
could not stay seated for more than ten to fifteen minutes without needing reposition.  (R. at 56.)
The heaviest weight that Plaintiff could lift was five pounds.  (R. at 56.)  Plaintiff had difficulty
grasping items with her hands — the right more so than the left.  (R. at 57.)  She had surgery on
her right hand and wrist to correct a damaged tendon, but this did not help much with Plaintiff's
pain or strength.  (R. at 57.)  She also experienced swelling in her lower back.  (R. at 58.)

Plaintiff received treatment for depression and anxiety from her rheumatologist since
August of 2009, but had not seen any kind of psychiatrist, psychologist or therapist.  (R. at 58.)

Her symptoms included mood swings and panic attacks. (R. at 58-59.) Plaintiff's medications reduced the frequency of her panic attacks. (R. at 59.) Plaintiff did not socialize or attend events. (R. at 61.) She left the house less than once a week on errands, driving for only five to ten minutes, and she no longer did grocery shopping for the family. (R. at 60-61.)

Plaintiff had trouble manipulating with her fingers, and she could not pick a coin off the table with her right hand, though she could with her left hand. (R. at 63.) She only used a computer for a couple minutes at a time, because using a mouse was hard and she could not type much. (R. at 64.) On a good day, however, she was able to function and take care of things without relying on her sister or husband. (R. at 64.) Plaintiff estimated that she had one to two good days a week, one to three really bad days and the rest were average. (R. at 64.) Plaintiff also testified that her persistent fatigue and stiffness that resulted from any activity, including sitting, precluded her from finding work. (R. at 71.)

E.  Vocational Expert Testimony

During the hearing on August 11, 2009, a vocational expert ("VE") testified that Plaintiff's former work as an assistant director and director of a daycare school was medium-duty/exertion and skilled, and Plaintiff's teaching assistant position was light exertion and skilled. (R. at 137.) The VE testified that an individual with the same age, education and work experience as Plaintiff, who could lift up to ten pounds occasionally and slightly less than ten pounds frequently, stand/walk up to three hours, sit for about five hours, has some limitations in pushing and pulling with both of their upper extremities and a limitation on reaching, could do no more than occasional fingering, and must avoid even moderate exposure to wetness and humidity, could still perform work as a teacher's assistant or other sedentary, unskilled jobs. (R. at 138.) These jobs included call-out operator with 45,000 positions in the national economy and

2,000 in Virginia, and surveillance system monitor with 80,000 positions nationally and 1,900 in Virginia. (R. at 138-39.) The VE also testified that if an individual would miss two or more workdays a month for medical care, she would exceed the routinely provided annual and/or sick leave in these types of positions, and thus would be precluded from work. (R. at 139.) Additionally, if even occasional use of the hands for fingering was impossible for an individual, the identified employments would again be precluded. (R. at 139.)

During Plaintiff's April 12, 2012 hearing, the VE identified Plaintiff's former work as a residential counselor at the group home as sedentary and skilled, and Plaintiff's work as the director of a daycare center as light-exertion and skilled. (R. at 79.) The VE further testified that an individual who could lift five pounds frequently and up to ten pounds occasionally, must never crawl or climb ropes, ladders or scaffolding, could remain postural to an "occasional" extent, could never use foot pedals or foot controls, could reach overhead bilaterally frequently, could stand and walk no more than two hours in an eight-hour day, had no sitting restrictions, and could use both hands for reaching, grasping and handling at no more than the occasional level, could not perform Plaintiff's past work. (R. at 81-85.) The VE indicated that such a person could still perform jobs that existed in the economy, specifically those of call-out operator with approximately 60,000 positions in the national economy and 1,000 in Virginia, and surveillance system monitor with approximately 80,000 positions in the national economy and 2,000 in Virginia. (R. at 84-85.) However, the VE testified that if an individual could not stay focused on the job site or task at hand for 80 percent of the workday, needed more than normal breaks during a workday or missed more than two days of work each month consistently, all work would be precluded. (R. at 85-86.)

15

## II. PROCEDURAL HISTORY

On November 14, 2007, Plaintiff filed an application for DIB, claiming disability due to RA. (R. at 252.)  Plaintiff's claim was denied initially on May 9, 2008, and again on reconsideration on February 5, 2009. (R. at 144-45.)  Plaintiff filed a written request for a hearing, which was granted and held before an ALJ on August 11, 2009. (R. at 176-81.)  On September 28, 2009, the ALJ issued a written decision finding that Plaintiff was not disabled under the Act. (R. at 158.)  On July 29, 2011, the Appeals Council granted Plaintiff's request for review and remanded the issue. (R. at 159.)  Upon remand, the ALJ held an administrative hearing on April 12, 2012, receiving testimony from a VE and Plaintiff, represented by counsel. (R. at 46.)  On April 27, 2012, the ALJ denied Plaintiff's claim, concluding that she was not disabled under the Act. (R. at 39.)  On June 21, 2013, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court. (R. at 3.)

## III. QUESTIONS PRESENTED

1.  Did the ALJ err in affording less than controlling weight to Plaintiff's treating physician?

2.  Did the ALJ err in assessing Plaintiff's credibility?

## IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether substantial evidence in the record supports the Commissioner's decision and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)).  Substantial evidence is more than a scintilla, is less than a preponderance and is the kind of relevant evidence that a reasonable mind could accept as adequate to support a

conclusion. *Hancock*, 667 F.3d at 472; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).

To determine whether substantial evidence exists, the Court must examine the record as a whole, but may not "'undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ].'" *Hancock*, 667 F.3d at 472 (quoting *Johnson*, 434 F.3d at 653). In considering the decision of the Commissioner based on the record as a whole, the Court must "'take into account whatever in the record fairly detracts from its weight.'" *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, are conclusive and must be affirmed regardless of whether the reviewing court disagrees with such findings. *Hancock*, 667 F.3d at 477. If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the Court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2000). An ALJ conducts the analysis for the Commissioner, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied, and whether substantial evidence in the record supports the resulting decision of the Commissioner. *Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA"). 20 C.F.R. §§ 416.920(b), 404.1520(b). SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that

involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like, are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.*

If the claimant establishes that she did not engage in SGA, the second step of the analysis requires her to prove that she has "a severe impairment . . . or combination of impairments which significantly limit[s] [her] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ must determine whether the claimant can return to his past relevant work[4] based on an assessment of

---

[4]     Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

the claimant's RFC[5] and the "physical and mental demands of work [the claimant] has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e).  If such work can be performed, then benefits will not be awarded.  *Id.*  The burden of proof remains with the claimant through step four of the analysis, such that she must prove that her limitations preclude her from performing her past relevant work.  *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock,* 667 F.3d at 472.

However, if the claimant cannot perform her past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy.  20 C.F.R. §§ 416.920(f), 404.1520(f); *Powers v. Apfel,* 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert,* 482 U.S. at 146 n.5).  The Commissioner can carry her burden in the final step with the testimony of a VE.  When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform.  *Walker v. Bowen,* 889 F.2d 47, 50 (4th Cir. 1989).  Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful."  *Id.*  If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits.  20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

---

[5]       RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."  SSR-96-8p.  When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record."  *Id.* (footnote omitted).

# V. ANALYSIS

A. The ALJ's Decision

On April 12, 2012, the ALJ held a hearing during which the Plaintiff, represented by counsel, and a VE testified. (R. at 46-47.) On April 27, 2012, the ALJ rendered his decision in a written opinion and determined that Plaintiff was not disabled under the Act. (R. at 39.)

After finding that the Plaintiff met the insured status requirements of the Act through September 20, 2012, the ALJ proceeded to follow the five-step sequential evaluation process in determining whether Plaintiff was disabled. (R. at 27); *see also* 20 C.F.R. § 404.1520(a). First, the ALJ determined that Plaintiff had not engaged in SGA. (R. at 27.) At step two, the ALJ determined that Plaintiff suffered the severe impairments of RA and depression. (R. at 27.) At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of one of the listed impairments in 20. C.F.R. Part 404, Subpart P, Appendix 1. (R. at 28); *see* 20 C.F.R. §§ 404.1520(d), 404.1526;. The ALJ further found that Plaintiff had the RFC to perform sedentary work with certain limitations. (R. at 30.) The ALJ found that Plaintiff could not perform any of her past relevant work. (R. at 38.) Finally, at step five of the analysis, the ALJ found that, based upon VE testimony and considering Plaintiff's age, education, work experience and RFC, jobs existed in significant numbers in the national economy that Plaintiff could perform. (R. at 38.) Accordingly, the ALJ determined that Plaintiff was not disabled under the Act. (R. at 39.)

Plaintiff challenges the ALJ's decision, arguing that the ALJ failed to accord Plaintiff's treating physician controlling weight, that the ALJ incorrectly assessed Plaintiff's credibility and, as a result, erred in determining Plaintiff's RFC. (Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") (ECF No. 10) at 9.)

B. Substantial evidence supports the ALJ's decision to afford less than controlling
weight to Plaintiff's treating physician's opinion.

Plaintiff argues that the ALJ erred in affording Plaintiff's treating physician's opinion

less than controlling weight. (Pl.'s Mem. at 19.)  Defendant maintains that substantial evidence

supports the ALJ's decision to afford Plaintiff's treating physician's opinion less than controlling

weight. (Def.'s Mot. for Summ. J. and Mem. in Supp. ("Def.'s Mem.") (ECF No. 13) at 22-26.)

During the sequential analysis, when the ALJ determines whether the claimant has a

medically-determinable severe impairment, or combination of impairments that would

significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ

must analyze the claimant's medical records that are provided and any medical evidence

resulting from consultative examinations or medical expert evaluations that have been ordered.

20 C.F.R. § 416.912(f).  When the record contains a number of different medical opinions,

including those from Plaintiff's treating physician, consultative examiners or other sources that

are consistent with each other, then the ALJ makes a determination based on that evidence.  20.

C.F.R. § 416.927(c)(2).  If, however, the medical opinions are inconsistent internally with each

other or other evidence, the ALJ must evaluate the opinions and assign them respective weight to

properly analyze the evidence involved.  20 C.F.R. §§ 416.927(c)(2), (d).

Under the applicable regulations and case law, a treating physician's opinion must be

given controlling weight if it is well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with other substantial evidence in the record.

*Craig*, 76 F.3d at 590; 20 C.F.R. § 416.927(d)(2); SSR 96-2p.  Further, the regulations do not

require that the ALJ accept opinions from a treating physician in every situation, *e.g.*, when the

physician opines on the issue of whether the claimant is disabled for purposes of employment (an

21

issue reserved for the Commissioner), or when the physician's opinion is inconsistent with other evidence, or when it is not otherwise well-supported. 20 C.F.R. §§ 404.1527(d)(3)-(4), (e).

The ALJ must consider the following when evaluating a treating physician's opinions: (1) the length of the treating physician relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating physician; and (6) any other relevant factors. 20 C.F.R. § 404.1527(d)(2)-(6). However, those same regulations specifically vest the ALJ—not the treating physician—with authority to determine whether a claimant is disabled, as that term is defined by statute. 20 C.F.R. § 404.1527(e)(1).

Here, Dr. Lomeo's RFC assessment from July 22, 2009, indicated that Plaintiff had the ability to sit, stand and/or walk for no more than 30 minutes at a time and for no more than one hour total in an eight-hour work day. (R. at 647.) Plaintiff could lift/carry five pounds only occasionally. (R. at 647.) Her RA interfered with her ability to perform both fine and gross dexterous movements with both her hands. (R. at 650.) Substantial evidence supports the ALJ's decision to afford less than controlling weight to Dr. Lomeo's RFC assessment.

Dr. Lomeo's own medical records support the ALJ's decision. On May 8, 2007, imaging of Plaintiff's spine revealed no arthropathy or bone erosions. (R. at 501.) On September 20, 2007, imaging showed no hip abnormality, no foot fracture or dislocation and no other bony abnormality. (R. at 531-32.) On October 23, 2007, Dr. Lomeo opined that Plaintiff's right foot had improved and noted that Plaintiff had no focal deficits and that Plaintiff tolerated her medications well. (R. at 517.) On February 11, 2008, Dr. Lomeo opined that Plaintiff was doing well and noted that she had less swelling in both hands. (R. at 518.) On June 4, 2008, Plaintiff

22

had no vision difficulties, fever or head trauma. (R. at 576.) A CT scan yielded normal results, and Dr. Lomeo opined that Plaintiff's arthritis was under control. (R. at 576.) On December 10, 2008, Dr. Lomeo opined that Plaintiff was doing well. (R. at 614.) On February 27, 2012, Dr. Lomeo again indicated that Plaintiff had no focal neurological deficits and that Plaintiff's arthritis improved on medication. (R. at 660.)

Other medical evidence supports the ALJ's decision as well. On January 25, 2009, Dr. Young indicated that Plaintiff was alert and oriented and demonstrated that she could stand and hop on one foot at a time and walk on her heels and toes. (R. at 581.) Dr. Young further opined that with breaks Plaintiff could stand or walk four hours in an eight-hour work day and had no restrictions on her sitting. (R. at 582.) Plaintiff could frequently lift less than ten pounds, while occasionally lifting ten pounds. (R. at 582.) On February 5, 2009, Dr. Amos opined that Plaintiff could occasionally lift twenty pounds and frequently lift ten pounds. (R. at 600.) On December 10, 2011, Dr. Chadra noted that Plaintiff was alert and oriented, had good concentration, had normal memory and had normal tandem walking. (R. at 656-67.) Further, Plaintiff had good hand-eye coordination, and her muscle strength rated at 5/5, except for her left hand grip, which rated at 4/5. (R. at 657.) Dr. Chandra also noted that Plaintiff had normal range of motion. (R. at 657.)

Plaintiff's own statements further support the ALJ's decision to afford less than controlling weight to Dr. Lomeo's opinion. Plaintiff indicated that she could perform ADLs, including using the bathroom, bathing, grooming and dressing herself without reminders or assistance. (R. at 320.) Plaintiff regularly prepared her own meals. (R. at 320.) Plaintiff went out on her own three to four times a week, often to her father's house or to the grocery store to buy food and household items. (R. at 322-23.) Plaintiff had no trouble following written or

spoken instructions. (R. at 324.) Plaintiff reported that she could handle money and count change. (R. 322-23.) Plaintiff could walk for 200 yards before needing to rest. (R. at 324.)

Plaintiff's hearing testimony also supports the ALJ's decision to afford less than controlling weight to Dr. Lomeo's opinion. Plaintiff testified that she used the computer. (R. at 114.) Typically, Plaintiff drove herself twice a week to visit friends or to go to her father's house, and she occasionally went out for coffee or to lunch. (R. at 115, 118.) For exercise, Plaintiff walked around a circle in her neighborhood for about 25 minutes at a time. (R. at 121.) Further, she could lift a gallon of milk. (R. at 123.) During the April 2012 hearing, Plaintiff stated that she continued to drive. (R. 60.) Plaintiff could pick up a coin off the table with her left hand. (R. at 63.) Therefore, substantial evidence supports the ALJ's determination to afford less than controlling weight to Dr. Lomeo's opinion.[6]

C. The ALJ did not err in assessing Plaintiff's credibility.

Plaintiff argues that substantial evidence fails to support the ALJ's determination regarding Plaintiff's credibility. (Pl.'s Mem. at 13.) Defendant maintains that substantial evidence supports the ALJ's credibility assessment. (Def.'s Mem. at 16.)

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine Plaintiff's RFC. 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's

---

[6]     Plaintiff argues that the statements submitted by her friends and family support Dr. Lomeo's conclusions. (Pl.'s Mem. at 29.) This Court is limited to determining whether substantial evidence in the record supports the Commissioner's decision. *Hancock*, 667 F.3d at 472 (citing *Johnson*, 434 F.3d at 653). This Court must affirm if substantial evidence supports the ALJ's decision. *Breeden*, 493 F.2d at 1007 (quoting *Universal Camera Corp.*, 340 U.S. at 488). Although these third-party statements may support Plaintiff's contentions regarding her condition, for the reasons discussed above, the ALJ's decision to afford Dr. Lomeo's opinion less than controlling weight is supported by substantial evidence.

24

credible complaints. In analyzing a claimant's subjective symptoms, the ALJ must follow a two-step analysis. *Craig*, 76 F.3d 585, 594 (4th Cir. 1996); *see also* SSR 96-7p; 20 C.F.R. §§ 404.1529(a) and 416.929(a). The first step is to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms. *Id.*; SSR 96-7p, at 1-3. The ALJ must consider all of the medical evidence in the record. *Craig*, 76 F.3d at 594-95; SSR 96-7p, at 5, n.3; *see also* SSR 96-8p, at 13 (specifically stating that the "RFC assessment must be based on *all* of the relevant evidence in the case record") (emphasis added). If the underlying impairment reasonably could be expected to produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence of the pain and the extent to which it affects the individual's ability to work. *Craig*, 76 F.3d at 595. The ALJ's evaluation must take into account "all the available evidence," including a credibility finding of the claimant's statements regarding the extent of the symptoms; the ALJ must provide specific reasons for the weight given to the individual's statements. *Craig*, 76 F.3d 595-96; SSR 96-7p, at 5-6, 11.

This Court must give great deference to the ALJ's credibility determinations. *See Eldeco, Inc. v. N.L.R.B.*, 132 F.3d 1007, 1011 (4th Cir. 1997). The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Id.* (quoting *N.L.R.B. v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason

at all.'" *Id.* (quoting *N.L.R.B. v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)).

Furthermore, it is well established that Plaintiff's subjective allegations of pain are not, alone, conclusive evidence that Plaintiff is disabled. *Mickles v. Shalala*, 29 F.3d 918, 919 (4th Cir. 1994). The Fourth Circuit has determined that "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig*, 76 F.3d at 591.

The ALJ concluded that based on the evidence, while Plaintiff did suffer from RA and depression, Plaintiff's testimony and statements describing the frequency and severity of her symptoms and the extent of her functional limitations were inconsistent with the Plaintiff's routine and conservative medical treatment and the objective findings of the record. (R. at 36.) Substantial evidence supports the ALJ's credibility determination.

Substantial evidence supports the ALJ's credibility determination on the basis that her treatment was generally routine and conservative. Except for one hand surgery, from which Plaintiff reportedly healed well within two months, Plaintiff's pain and symptoms were treated with non-surgical measures. (R. at 671.) Plaintiff's treating physician monitored Plaintiff continuously on medication, changing prescriptions when necessary and noting multiple times that Plaintiff tolerated her medications well. (R. at 517-18, 578, 666.) Dr. Lomeo frequently reported that the medications were helping. (R. at 578, 661, 665.) Plaintiff alleged that she suffered from depression, anxiety, and panic attacks, but had not sought treatment from a mental health specialist. (R. at 58.) Plaintiff testified that she had done some physical therapy in the past. (R. at 121.)

26

Substantial evidence further supports the ALJ's credibility determination on the basis that Plaintiff's complaints of severe limitation and constant pain were inconsistent with the objective medical evidence. On May 8, 2007, Dr. Lomeo indicated that imaging only revealed mild changes of arthropathy in Plaintiff's right hand. (R. at 501.) On October 23, 2007, Dr. Lomeo noted that Plaintiff's foot was doing better. (R. at 517.) On February 11, 2008, Dr. Lomeo indicated that Plaintiff was "doing well on Remicade," was not experiencing stiffness, and that she had less swelling in both of her hands. (R. at 518.) On June 4, 2008, Dr. Lomeo reported that Plaintiff's RA was under control. (R. at 576.) On March 16, 2009, Plaintiff had no joint swelling or pain at all. (R. at 612.) On January 24, 2011, Dr. Lomeo stated that Plaintiff was "doing well on Actemra." (R. at 666.) On December 10, 2011, Dr. Chandra noted that Plaintiff had normal tandem walking and full range of motion. (R. at 657.) On February 27, 2012, Dr. Lomeo noted that Plaintiff's condition improved with medication. (R. at 660.)

Plaintiff's own statements further support the ALJ's determination of Plaintiff's credibility determination. Plaintiff's bedroom was on the second floor of the family home. (R. at 51.) Plaintiff was still capable of taking care of her personal needs and preparing her own meals. (R. at 320.) Plaintiff testified that she could lift a gallon of milk. (R. at 123.) Plaintiff also helped out with household cleaning. (R. at 321.) Plaintiff could go out by herself and drive herself. (R. at 115, 322.)

## VI. CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 9) be DENIED; that Defendant's Motion for Summary Judgment (ECF No. 13) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable James R. Spencer and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a <u>de novo</u> review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

_____ /s/
David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date:  September 2, 2014